RTP:MCM
F. #2016R00182

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | **TO BE FILED UNDER SEAL** |
| - against -- | 19-M-717 |
| RICHARD GAMBALE,<br>RUSSELL CARLUCCI,<br>RAMY JOUDEH and<br>DANIEL ETKIN | **COMPLAINT AND AFFIDAVIT IN<br>SUPPORT OF APPLICATION FOR<br>ARREST WARRANTS**  |
| Defendants. | (T. 18, U.S.C. §§ 841(b)(1)(B)(vii) and 846) |



PAUL HARRIS, being first duly sworn, deposes and states that he is a Special

Agent with the Federal Bureau of Investigation (the "FBI"), duly appointed according to law

and acting as such.

In or about and between June 2014 and March 2016, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants RICHARD GAMBALE, RUSSELL CARLUCCI, RAMY JOUDEH and

DANIEL ETKIN, together with others, did knowingly and intentionally conspire to

distribute and possess with intent to distribute a controlled substance, which offense involved

a substance containing marijuana, a Schedule I controlled substance, contrary to Title 21, United States Code, Section 841(a). The amount of marijuana attributable to each defendant as a result of his own conduct, and the conduct of other conspirators reasonably foreseeable to him, was 100 kilograms or more of a substance containing marijuana.

(Title 21, United States Code, Sections 846 and 841(b)(1)(B)(vii))



The source of your deponent's information and the grounds for his belief are as follows:

1.     I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been employed as an agent with the FBI since 1999. I am responsible for conducting and assisting in investigations into the activities of individuals and criminal groups responsible for various crimes, including crimes such as narcotics trafficking, organized

2

crime, armed robbery and other offenses. These investigations are conducted both in an undercover and overt capacity. As part of these investigations, I am responsible for, among other things, executing search warrants and arrest warrants, reviewing records, conducting surveillance and debriefing witnesses and victims. I have also participated in investigations which involve the search and seizure of electronic devices and data. Through my training and experience, I have become familiar with the techniques and methods of operation used by individuals involved in criminal activity to conceal their activities from detection by law enforcement authorities.

2.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested arrest ▮▮

▮▮▮▮ warrants and does not set forth all of my knowledge about this matter.

3.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of, among other things, Title 21, United States Code, Sections 841 and 846 (distribution, possession with intent to distribute, and conspiracy to distribute and possess with the intent to distribute narcotics) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (collectively, the "SUBJECT

OFFENSES") have been committed, are being committed, and will be committed by multiple individuals. The targets of the investigation include, but are not limited to, the defendants RICHARD GAMBALE, RUSSELL CARLUCCI, RAMY JOUDEH and DANIEL ETKIN (collectively the "TARGET DEFENDANTS"), as well as Gregory Kazdan, Michael Liguori, Jose Bonachea-Garcia and Michael Garcia (collectively the

3

"PREVIOUSLY INDICTED DEFENDANTS") (hereinafter the TARGET DEFENDANTS

and the PREVIOUSLY INDICTED DEFENDANTS are collectively referred to as the "CO-

CONSPIRATORS") and others. █████████████████████████████

███████████████████████████████████████████████

████████████████████████████

### PROBABLE CAUSE

I.     ███████████████ **the Defendants**

   A.     ████████████

   4.     The investigation has revealed that ███████████████ is subscribed to

████████████ A database search has revealed that ██████████ is the defendant

RICHARD GAMBALE's ████████████████████████████

   5.     As explained in further detail below, ████████████████ was seized from

the defendant RICHARD GAMBALE's person pursuant to an August 25, 2015 arrest after

he was discovered by law enforcement in a residence containing large quantities of

marijuana, methamphetamines, firearms and ammunition.  During his booking for the August

25, 2015 arrest, GAMBALE provided law enforcement the cellular telephone number

associated with ████████████ as his contact number. ████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████

### B. Richard Gambale

6.      The defendant RICHARD GAMBALE is a natural-born United States citizen who resides in Staten Island, New York and is 45 years old.

### C. Russell Carlucci

7.      The defendant RUSSELL CARLUCCI is a natural-born citizen who is believed to reside in Staten Island, New York and is approximately 46 years old.

### D. Ramy Joudeh

8.      The defendant RAMY JOUDEH is a natural-born citizen who resides in Staten Island, New York and is 33 years old.

### E. Daniel Etkin

9.      The defendant DANIEL ETKIN is a natural-born United States citizen who resides in Brooklyn, New York and is 33 years old.

## II.    The Relevant Criminal Activity

10.      Since March 2015, the FBI, the Drug Enforcement Administration ("DEA") and the South Plainfield Police Department ("SPPD") have been investigating drug trafficking, and related criminal activity, engaged in by members, including the CO-CONSPIRATORS, of a multi-state drug trafficking operation operating in part out of J&J Dumping, Inc. ("J&J Dumping"), an auto shop located at 500 Hollywood Avenue in South Plainfield, New Jersey ("500 Hollywood Avenue") operated by one of the PREVIOUSLY INDICTED DEFENDANTS Jose Bonachea-Garcia, Jr. Based on my training, experience and the investigation thus far, there is probable cause to believe that as part of the drug trafficking operation, the CO-CONSPIRATORS and others facilitated the interstate shipment

5

of large crates containing illegal drug contraband and proceeds transported between 500 Hollywood Avenue and California, among other locations. As detailed below, the investigation has revealed that the CO-CONSPIRATORS shipped these crates in a manner to conceal the illicit nature of the contents, using, among other things, names of fictitious companies to evade detection. As described in further detail below, during the course of the conspiracy, several of the CO-CONSPIRATORS, including the TARGET DEFENDANTS, engaged in regular communication via telephone, including via ████████████

████████████, in order to facilitate the shipments and the drug operation as a whole. In addition, several of the TARGET DEFENDANTS participated in the collection of proceeds related to the drug operation.

11.     In connection with this investigation, on or about June 1, 2017, a grand jury sitting in the Eastern District of New York issued a two-count indictment charging the PREVIOUSLY INDICTED DEFENDANTS Michael Liguori, Gregory Kazdan, Jose Bonachea-Garcia and Michael Garcia with conspiracy to distribute in violation of Title 21, United States Code, Sections 841(b) and 846, and possession with intent to distribute a controlled substance, in violation of Title 21, United States Code, Sections 841(a) and 841(b). The indictment stems from the defendants' participation in the drug trafficking conspiracy described herein, beginning from at least June 2014. (See United States v. Michael Liguori, et al., 17-cr-295 (DLI)). Three of the four defendants have pleaded guilty to participating in the charged drug trafficking conspiracy.

12.     As set forth below, there is probable cause to believe that the TARGET DEFENDANTS participated in the drug trafficking operation described herein.

6

A.   The March 27, 2015 Marijuana Seizure

13.   On or about March 26, 2015, the FBI began investigating an armed robbery of a crate picked up from the auto shop at 500 Hollywood Avenue (the "Crate") by a delivery truck on March 26, 2015. Based on this investigation, and as set forth below, I believe that the Crate contained illicit proceeds related to the drug trafficking operation described herein.

14.   The Crate was scheduled to be delivered in a box truck to a third party carrier and shipped to California. Specifically, a review of the invoice for the Crate revealed that it was being shipped by "JP Trucking Dismantlers," located at 500 Hollywood Avenue in South Plainfield, and that the intended recipient of the Crate was "The Display Guys" in Compton, California. The invoice also stated that the Crate weighed 787 pounds and contained "Machine parts - Display Materials." On March 26, 2015, after the Crate was picked up from the auto shop, the driver of the box truck was stopped a short distance from 500 Hollywood Avenue and held at gunpoint by at least two men. During the robbery, the Crate was taken from the back of the truck and placed into a white van.

15.   During its investigation of the armed robbery, which, among other things, included research into the addresses related to the delivery of the Crate that was stolen, law enforcement officers discovered that a delivery of two other crates (the "Two Crates") had recently been shipped from California by a sender also using the name "The Display Guys" via air transport. The recipient's information for the delivery of the Two Crates was listed as "JP Truck Dismantlers, 500 Hollywood Ave, South Plainfield, NJ 07080, US." The contact person was listed as Juan Gutierrez. The investigation has revealed that neither the company "The Display Guys" nor the company "JP Truck Dismantlers" is doing business at the

7

respective addresses provided. Based on the investigation, as well as my training and experience, it is my belief that these are fictitious companies.

16.     During its investigation, law enforcement agents also discovered that the Two Crates were scheduled to be delivered to 500 Hollywood Avenue on March 27, 2015, the day after the armed robbery. As of the afternoon of March 27, 2015, however, the Two Crates had not yet been delivered to their final destination and were in the facilities of a private freight company in Newark, New Jersey, which entity's identity is known to the undersigned and hereinafter referred to as (the "Private Freight Company").

17.     On the afternoon of March 27, 2015, pursuant to their authority under the Private Freight Company's shipping contract, employees authorized agents from the DEA to inspect the contents of the Two Crates on the Private Freight Company's premises, during which inspection the DEA discovered more than 550 pounds of marijuana.

18.     On the evening of March 27, 2015, Michael Liguori, one of the PREVIOUSLY INDICTED DEFENDANTS, arrived at the Private Freight Company warehouse in Newark, New Jersey to pick up the Two Crates. Liguori arrived driving a Penske rental truck (the "Penske Truck"). After the Two Crates were loaded into the Penske Truck, Liguori drove the truck away from the premises. Thereafter, law enforcement agents conducted a motor vehicle stop of the Penske Truck and arrested Liguori. Liguori was placed under arrest on March 27, 2015. At the time of his arrest, after being advised of his rights, Liguori stated, in sum, substance and in part, that he was on his way to Staten Island prior to being stopped by the police.

19.     As part of the investigation, law enforcement agents obtained the rental agreement for the Penske Truck driven by Liguori, which indicated that the truck was rented by the customer "JP Truck Dismantlers, 500 Hollywood Ave, Newark, NJ 07070" and that the driver of the van was listed as "Gregory Kazdan," one of the PREVIOUSLY INDICTED DEFENDANTS. An employee at the rental location advised law enforcement that two men came in to rent the van. The Penske Truck was rented only hours before Liguori was pulled over by law enforcement in the truck containing the Two Crates, which were filled with marijuana.

20.     Prior to the motor vehicle stop, law enforcement officers observed Liguori talking on a cellular telephone while he was driving the Penske Truck containing the Two Crates. At the time of his arrest, Liguori was in possession of two cellular telephones, both of which were seized by law enforcement officers. One of the telephones was a cellular "flip phone" ("Liguori's Flip Phone"); the other phone in Liguori's possession was an iPhone ("Liguori's iPhone"). A review of Liguori's Flip Phone revealed that it contained one telephone number, which was saved under the contact name "G" ("G's Phone").

B.     Use of 500 Hollywood Avenue to Traffic and Store Drugs

21.     Based on the investigation, there is probable cause to believe that the CO-CONSPIRATORS used 500 Hollywood Avenue as a location to store and package drugs during the course of the drug trafficking operation. As noted above, 500 Hollywood Avenue was listed as the recipient address on the Two Crates seized by law enforcement on March 27, 2015, which contained large quantities of marijuana. In addition, as discussed below, a search of 500 Hollywood Avenue revealed evidence of the presence of drugs at the auto shop

9

at 500 Hollywood Avenue.  Moreover, a review of electronic messages between one of the

PREVIOUSLY INDICTED DEFENDANTS Jose Bonachea-Garcia, Jr., who managed the

auto shop at 500 Hollywood Avenue and others revealed that 500 Hollywood Avenue was

used by the CO-CONSPIRATORS to traffic illegal drugs.

            1.  Law Enforcement's Search of 500 Hollywood Avenue

        22.     On or about April 2, 2015, law enforcement officers executed a judicially

authorized search warrant signed by the Honorable Michael A. Toto, Middlesex County

Superior Court Judge for the State of New Jersey, of Bonachea-Garcia's business at 500

Hollywood Avenue.  Present during the execution of the search was a certified narcotics

detection canine handler and his trained canine Kaiser.[1]

        23.     I was advised by law enforcement that Kaiser was deployed throughout

various areas of the business, including the trailer housing the offices, the shop and the

storage area behind the shop.  I have been advised by the canine handler that Kaiser's

---

[1]    I was advised that the canine handler has been in law enforcement approximately 16 years and has been with the South Plainfield Police Department since October 2005.  I was also advised that he has been a handler since December 2012.  I was further advised that Kaiser is a German Shepherd, originally certified as a narcotics detection/patrol canine after completing canine training and certification at the Union County Sheriff Canine Academy in December 2012.  Kaiser was certified to detect the odors of marijuana, hashish, cocaine, crack cocaine, heroin, ecstasy, methamphetamines, crystal meth and various deviations of these controlled substances.  Kaiser is also certified in tracking people, evidence recovery and building searches.  Kaiser has received numerous hours of training and is utilized on a daily basis for the purpose of detecting narcotic and marijuana odors.  Kaiser is deployed to conduct searches of, among other things, packages, containers, vehicles, buildings and their contents.  Kaiser has been involved in over 100 controlled substances searches and has made numerous positive identifications.  He has also been involved in over 200 training exercises.  Kaiser was last certified in March 2019.  At the time of the search, Kaiser had last been certified on March 17 and 18, 2015.

reaction at the time of the search indicated that there was a high likelihood that a controlled substance was present in the shop at a previous time recent to the date of the search. At the time of the search, Kaiser did not indicate the current presence of a controlled substance and no controlled substance was recovered by law enforcement; however, I have been advised by the canine handler that Kaiser's behavioral changes at the time of the search, which included wagging of the tail, breathing deeply, hovering, and showing particular interest in certain areas within the shop, (including the back area of the shop and a cart located inside the shop), indicated the presence of the odor of a controlled substance. I was further advised that narcotics detection canines are trained to react to the odor of narcotics and other controlled substances, and that certain behavioral changes, even where no identifiable controlled substance is ultimately found, may suggest the recent presence of a controlled substance in a location because such controlled substance's odor may linger for a period of time in a location based on various environmental factors. Based on this information, as well as my training and experience and the investigation thus far, it is the undersigned's belief that one or more controlled substances had been present at Bonachea-Garcia's shop located at 500 Hollywood Avenue at some recent time prior to the April 2, 2015 search.

2. <u>Text Messages Related to Drug Activity at 500 Hollywood Avenue</u>

24. On or about April 2, 2015, the Honorable Michael A. Toto, Middlesex County Superior Court Judge for the State of New Jersey, authorized a search of a cellular telephone with an assigned telephone number subscribed to by "Jose L. Bonachea-Garcia" ("Bonachea-Garcia's Phone"). A review of Bonachea-Garcia's Phone revealed several Spanish language

communications via WhatsApp Messenger ("WhatsApp")[2] and text messages between

Bonachea-Garcia's Phone, a cellular telephone number subscribed to by "Miguel Garcia"

("Garcia's Phone"),[3] and others related to the CO-CONSPIRATORS' criminal drug activity.

25.    A review of the text messages revealed, based on my training and experience,

as well as the investigation, that on several occasions between January 2015 and March

2015, in close proximity to the dates of the deliveries to and pick-ups from 500 Hollywood

Avenue described above, Bonachea-Garcia's Phone and Garcia's Phone had numerous

communications that related to the delivery and packaging of drugs at the auto shop, the

division of the controlled substances amongst the co-conspirators, as well as the price for

selling such controlled substances to customers, and the quality of the controlled substance.

In addition, the communications related to the creation of "boxes" for packaging the

controlled substances consistent with one or more dates of deliveries or pickup to the shop at

500 Hollywood Avenue.

26.    While the text messages used coded language to refer to the drugs (e.g., "spare

parts"), based on the investigation, as well as my training and experience, there is probable

cause to believe that the references were related to the drug activity.  For example, in one of

the electronic message exchanges related to the status of drug inventory present at the shop

---

[2]    WhatsApp is an instant messaging application for smartphones.  Users of WhatsApp can use the internet to, among other things, make voice calls and video calls and send text messages, documents, images, video and audio files.

[3]    Based on the investigation thus far the name "Miguel Garcia" referred to Michael Garcia, one of the PREVIOUSLY INDICTED DEFENDANTS.

sent during the relevant time period, Bonachea-Garcia's Phone sent an electronic message to Garcia's Phone that included an attachment. A review of the attachment revealed a photograph of a piece of paper containing three handwritten words with numbers written to the left of them. Specifically, the piece of paper had the following list written vertically on the piece of paper: "39 AK."; "44 BuBBΔ."; and "17 PuRpLE Tw." Based on my training and experience, as well as the investigation thus far, it is my belief that these handwritten words referred to known strains of marijuana and that the numbers next to each handwritten word represented the quantity of each strain for which they were accounting. In addition, a review of the marijuana packages seized on March 27, 2015, from Liguori revealed at least one of the same strains of marijuana that were contained in that shipment.

C.    Trafficking of Shipments Between California and 500 Hollywood Avenue

27.    Based on the investigation, there is also probable cause to believe that the CO-CONSPIRATORS have trafficked multiple shipments containing drugs, drug proceeds and other contraband connected to the drug trafficking conspiracy between 500 Hollywood Avenue and California, among other locations. As explained in further detail below, the investigation has revealed a pattern of shipments of crates shipped between 500 Hollywood Avenue and California using fictitious company names. For example, between January 2015 and March 2015, invoices on multiple crates using the company names The Display Guys in Compton California and TJ Machining in Oakland, California, as wells as the company names Roman Trucking, JP Trucking, Inc. and JP Truck Dismantlers at 500 Hollywood Avenue. Based on the investigation none of these purported companies was doing business at the respective addresses provided. Based on my training and experience, these false entity

13

names were used in order to conceal the illicit nature of the contents of the shipments and to conceal the true identity of the shippers and recipients in order to avoid detection by law enforcement.

28.     Moreover, a review of telephone records for the CO-CONSPIRATORS, among others, has revealed multiple contacts between the CO-CONSPIRATORS and others on or about the dates surrounding these shipments.[4] Based on my training and experience, as well as the investigation thus far, these communications were likely efforts by the CO-CONSPIRATORS to coordinate in anticipation of receipt or shipment of, or otherwise discuss, the drugs and other contraband related to the illegal drug trafficking.

29.     With respect to several of the TARGET DEFENDANTS specifically, a review of telephone records revealed that during the timeframe that deliveries and pick-ups were made to and from 500 Hollywood Avenue, the defendant RICHARD GAMBALE had frequent telephone contact with the defendants RUSSELL CARLUCCI and RAMY JOUDEH, as well as with one of the PREVIOUSLY INDICTED DEFENDANTS Michael Garcia. For example, between January 2015 and March 2015, ███████████████, hereinafter also referred to as "GAMBALE's Phone," had approximately 100 telephone contacts with Garcia's Phone, with the communications largely concentrated in the few days before, on or after a pick-up or delivery date.

---

[4]     The approximate number of contacts between individuals listed below includes all known telephone contacts, e.g., texts, voice calls, and attempted calls.

14

30.     Moreover, a search of GAMBALE's Phone ██████████████ and a review of telephone records revealed multiple telephone contacts with a telephone number stored in GAMBALE's Phone under the name "Ramy." The telephone number listed under the name "Ramy" in GAMBALE's Phone is the same number as the telephone number assigned to a cellular telephone subscribed to by ██████████ and used by the defendant RAMY JOUDEH (JOUDEH's Phone). [5]  A review of telephone records reveals that GAMBALE's Phone and the JOUDEH Phone were in contact more than 40 times between January 2015 and March 2015 and that these contacts were likewise concentrated on or around several dates of pick-ups and deliveries of crates to and from 500 Hollywood Avenue.

31.     Telephone records also reveal that GAMBALE's Phone and a cellular telephone number used by and associated with the defendant RUSSELL CARLUCCI ("CARLUCCI's Phone") had more than 230 contacts concentrated on or around the dates of pick-ups and deliveries to and from 500 Hollywood Avenue. CARLUCCI's Phone is subscribed to by a known close associate of CARLUCCI's and, based on a review of a July 2015

---

[5]     Based on the investigation, ██████████ is the defendant RAMY JOUDEH's ██████. In addition, based on the investigation, the defendant RAMY JOUDEH was the primary user of JOUDEH's Phone, including during the relevant time period. For example, a review of a resume submitted by JOUDEH for employment lists the same telephone number as that assigned to JOUDEH's Phone as the contact telephone number for "Ramy H. Joudeh." In addition, a review of an April 5, 2017 police report lists the cellular telephone number for "Ramy H. Joudeh" as the same number assigned to JOUDEH's Phone. Moreover, as set forth below, JOUDEH's Phone was subject to judicially authorized interception of communications sent to and from JOUDEH's Phone during the course of the drug conspiracy, which revealed that JOUDEH was the primary user of JOUDEH's Phone.

Police Incident Report, was provided to law enforcement as CARLUCCI's telephone number by CARLUCCI's another close associate during an interview. Telephone records for other individuals included among the CO-CONSPIRATORS also revealed frequent contacts concentrated on and around dates of pick-ups and deliveries at 500 Hollywood Avenue as discussed below.

1.    The January 15, 2015 Pick-Up

32.    The investigation has revealed that on January 15, 2015, a crate weighing approximately 750 pounds was shipped from JP Trucking, Inc. at 500 Hollywood Avenue to the Display Guys in Compton, California (the "January 15 Pick-Up"). A review of cellular telephone records reveals that several of the CO-CONSPIRATORS had regular contact on the day of and/or days surrounding the January 15 Pickup. For example:

a.    GAMBALE's Phone ████████████████ had multiple telephone contacts with JOUDEH's Phone, CARLUCCI's Phone and Garcia's Phone; and

b.    Garcia's Phone had multiple telephone contacts with Bonachea-Garcia's Phone and Liguori's iPhone, as well as at least one telephone contact cellular telephone number subscribed to by "Gregory Kazdan" ("Kazdan's Phone") multiple times.

2.    The February 6, 2015 Delivery

33.    The investigation has also revealed that on February 6, 2015, two crates weighing approximately 1500 pounds in total was delivered from The Display Guys in Compton, California to "Roman Trucking" at 500 Hollywood Avenue (the "February 6 Delivery"). A review of cellular telephone records reveals that several of the CO-CONSPIRATORS had regular contact on the day of and/or days surrounding the February 6 Delivery. For example:

16

    a. GAMBALE's Phone ▮▮▮▮▮▮▮▮ had multiple telephone contacts with Garcia's Phone, JOUDEH's Phone and CARLUCCI's Phone; and

    b. Garcia's Phone had one or more telephone contacts with Bonachea-Garcia's Phone, Liguori's iPhone and Kazdan's Phone.

3. The February 13, 2015 Delivery

34. The investigation has further revealed that on February 13, 2015, two crates weighing approximately 1225 pounds were delivered from The Display Guys to Roman Trucking at 500 Hollywood Avenue (the "February 13 Delivery"). A review of cellular telephone records reveals that several of the CO-CONSPIRATORS had regular contact on the day of and/or days surrounding the February 13 Delivery. For example:

    a. GAMBALE's Phone ▮▮▮▮▮▮▮▮ had multiple telephone contacts with JOUDEH's Phone, Garcia's Phone and CARLUCCI's Phone; and

    b. Garcia's Phone had multiple telephone contacts with Liguori's iPhone and Bonachea-Garcia's Phone.

4. The March 5, 2015 Pick-Up

35. The investigation has revealed that on March 5, 2015, a crate weighing approximated 725 pounds was shipped from JP Trucking Dismantlers c/o Roman Trucking at 500 Hollywood Avenue to TJ Machining in Oakland, California (the "March 5 Pick-Up"). A review of cellular telephone records reveals that several of the CO-CONSPIRATORS had regular contact on the day of and/or days surrounding the March 5 Pickup. For example:

    a. GAMBALE's Phone ▮▮▮▮▮▮▮▮ had multiple telephone contacts with JOUDEH's Phone and CARLUCCI's Phone;

    b. Kazdan's Phone had multiple contacts with CARLUCCI's Phone and Liguori's iPhone; and

17

    c. Garcia's Phone had multiple telephone contacts with Bonachea-Garcia's Phone.

    5. The March 20, 2015 Delivery

36. The investigation has further revealed that on March 20, 2015, two crates weighing approximately 1592 pounds were delivered from The Display Guys in Compton, California to JP Truck Dismantlers at 500 Hollywood Avenue (the "March 20 Delivery"). A review of cellular telephone records reveals that several of the CO-CONSPIRATORS had regular contact on the day of and/or days surrounding the March 20 Delivery. For example:

    a. GAMBALE's Phone ████████████ had multiple telephone contacts with JOUDEH's Phone and CARLUCCI's Phone.

    b. Garcia's Phone had multiple telephone contacts with Liguori's iPhone and Bonachea-Garcia's Phone;

    c. Liguori's iPhone had multiple telephone contacts with Bonachea-Garcia's Phone; and

    d. Kazdan's Phone had multiple contacts with CARLUCCI's Phone and Liguori's iPhone.

    6. March 26, 2015 Pick-Up

37. As discussed above, the investigation has revealed that on March 26, 2015, a crate weighing approximately 787 pounds was shipped from JP Trucking Dismantlers at 500 Hollywood Avenue to the Display Guys in Compton, California (the "March 26 Pick-Up"). A review of cellular telephone records reveals that several of the CO-CONSPIRATORS had regular contact on the day of and/or days surrounding the March 26 Pickup. For example:

    a. GAMBALE's Phone ████████████ had multiple telephone contacts with Garcia's Phone and CARLUCCI's Phone.

b. Garcia's Phone had multiple telephone contacts with Bonachea-Garcia's Phone and Liguori's iPhone;

c. Kazdan's Phone had multiple telephone contacts with CARLUCCI's Phone and Liguori's iPhone; and

d. Liguori's Flip Phone had multiple telephone contacts with G's Phone.

38.     A review of telephone records also revealed that Liguori had multiple telephone contacts with the number listed for the Private Freight Company on or about March 26, 2015.

39.     Moreover, a review of cell site data records obtained for CARLUCCI's Phone, Kazdan's Phone and Liguori's iPhone reflects that these telephones were all in the vicinity of the defendant RUSSELL CARLUCCI's residence in Staten Island, New York on the evening of March 25, 2015, the day before the March 26 Pick-Up. Based on my training and experience, as well as the investigation thus far, I believe that CARLUCCI, Liguori and Kazdan met in the vicinity of CARLUCCI's residence in order to discuss, among other things, plans regarding the March 26 Pick-Up.

7.  The March 27, 2015 Delivery

40.     As discussed above, the investigation has revealed that on March 27, 2015, the Two Crates, weighing approximately 1225 pounds, were delivered to the Private Freight Company from the Display Guys in Compton, California, listing JP Truck Dismantlers at 500 Hollywood Avenue as the intended recipients (the "March 27 Delivery"). As discussed above, as a result of the March 26 Robbery of the Crate bearing similar shipping information, the Two Crates were subsequently searched under the Private Freight Company's contractual authority and law enforcement officials discovered over 550 pounds of a substance that

19

tested positive for marijuana inside of the Two Crates. A review of cellular telephone records reveals that several of the CO-CONSPIRATORS had regular contact on the day of and days surrounding the March 27 Delivery. For example:

  a. Garcia's Phone had one or more telephone contacts with Liguori's iPhone and Kazdan's Phone.

  b. Kazdan's Phone had multiple telephone contacts with CARLUCCI's Phone; and

  c. Liguori's Flip Phone had multiple telephone contacts with G's Phone and the Private Freight Company.

41.     Based on my training and experience, as well as the investigation, there is probable cause to believe these shipments contained controlled substances and other illegal contraband related to the drug conspiracy and were trafficked between 500 Hollywood Avenue and locations in California, among other locations.

D.     The August 25, 2015 Search and Seizure in Lake County, California

42.     As detailed below, based on my training and experience, as well as the investigation thus far, there is probable cause to believe that the defendant RICHARD GAMBALE traveled to California for the purpose of acquiring and transporting large quantities of marijuana as part of the interstate drug distribution conspiracy described herein.

43.     For example, the investigation has revealed that in August 2015, the defendant RICHARD GAMBALE traveled to Lake County, California to facilitate the drug conspiracy. On August 25, 2015, law enforcement officers from the Lake County Sheriff's Office ("LCSO") executed a search warrant of a premises located at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Upon seeing law enforcement approach, several

20

individuals fled the premises and were not apprehended by law enforcement. During the search, law enforcement discovered various types of illegal contraband during the search. As a result, the defendant RICHARD GAMBALE, who was at the premises during the execution of the search, and several other individuals were taken into custody.

44.     I am advised that during the search of the premises, law enforcement discovered nine bags, each containing approximately one pound of marijuana, as well as another bag containing approximately two pounds of marijuana "shake," which typically refers to remnants from the marijuana plant resulting from handling and processing, and approximately 11 pounds of processed marijuana. I was further advised that law enforcement also discovered approximately 143 marijuana plants growing in the premises. In addition to the marijuana, during the search, law enforcement also discovered six bags, each bag containing approximately one pound of crystal methamphetamine, as well as various amounts of methamphetamine and a number of firearms and ammunition.

45.     I am further advised that law enforcement conducted a search of the defendant RICHARD GAMBALE's rental vehicle on August 25, 2015, which was located near the premises, pursuant to a positive alert for the odor of narcotics by the K9 narcotics dog present at the scene. During the search of the vehicle, law enforcement viewed a Fox Rent A Car rental agreement dated August 21, 2015, bearing GAMBALE's name; an August 23, 2015 receipt from a Wal-Mart store in Rohnert Park, California reflecting the purchase of travel duffle bags; and $54,000 in United States currency packaged in United States Postal Service envelopes.

46.     I am further advised that a search of the defendant RICHARD GAMBALE's person yielded $26,570 in United States currency from GAMBALE's shorts pockets. Also found on his person at this time were a White Samsung Galaxy S5, assigned telephone number ███████ (GAMBALE's Phone ████████████ along with a Samsung flip-style cellular telephone ("GAMBALE's Flip Phone") (collectively "GAMBALE's Devices").[6]

47.     After the search, the defendant RICHARD GAMBALE was arrested and taken into custody. GAMBALE was charged with unlawful cultivation of marijuana, possession of marijuana for sale and transportation of controlled substances, in violation of California Health and Safety Code Sections 11358, 11359, and 11379, respectively. GAMBALE was also charged with obstruction of a public officer in the discharge of his duty, in violation of California Penal Code Section 148(A)(1).[7]

48.     After being advised of and waiving his Miranda rights, the defendant RICHARD GAMBALE stated, among other things, that he was visiting from New York and had been in California since the previous Friday. He also stated that he had visited California looking for rental property. GAMBALE confirmed that he had rented the car

---

[6]     On or about May 24, 2016, a detective with the New York City Police Department working with the New York County District Attorney's Office submitted an application for a search warrant to search GAMBALE's Devices in relation to an investigation being conducted by the NYPD and the DEA in connection with the illegal sale of oxycodone and marijuana. A warrant was issued for GAMBALE's Devices on May 24, 2016 by the Honorable Bonnie G. Wittner, New York Supreme Court Justice.

[7]     The charges were subsequently dismissed on or about October 27, 2015.

located at the scene of the search and said he had arrived alone to the location of the search just prior to the execution of the search warrant. During a subsequent interview, GAMBALE admitted that he had shipped the $80,570 seized by LCSO to himself because he could not travel with that amount of money. GAMBALE claimed that he had brought the currency with him that day because he was looking to buy a pizza restaurant or other property and may have needed to act fast. Further, when questioned as to whether he was in California to sell or purchase narcotics, GAMBALE elected not to answer.[8]

49.     I am further advised that one of the other arrested individuals, after being advised of and waiving his/her Miranda rights, stated, in sum and substance, among other things, that the individual was friends with the defendant RICHARD GAMBALE, who was from New York and comes to California to buy marijuana. The individual advised law enforcement that s/he had arrived with GAMBALE to the premises about ten minutes prior to the execution of the search warrant. The individual also advised that GAMBALE and the individual have a mutual friend who put them in contact. The individual further stated that GAMBALE buys marijuana and takes it back to New York to sell.

50.     Based on my training and experience, the premises searched by the LCSO was being used to facilitate the sale of drugs. Further, based on my training and experience, given that law enforcement discovered large quantities of cash, marijuana, methamphetamines, firearms and ammunition at the premises, and given the defendant

---

[8]     The defendant RICHARD GAMBALE was released from LCSO custody on or about August 26, 2015.

RICHARD GAMBALE's presence at this location with thousands of dollars in cash on his person, among other things, there is probable cause to believe that GAMBALE was involved in the purchase of controlled substances as part of the conspiracy described herein.

51.     There is also probable cause to believe that the defendant RICHARD GAMBALE has engaged in the trafficking of controlled substances with one or more of the CO-CONSPIRATORS.  As discussed above, GAMBALE remained in regular contact with several of the CO-CONSPIRATORS on or around the dates of the shipments described above.  In addition, a review of GAMBALE's Phone ███████████████ revealed multiple contacts with a telephone number stored under the name "Ramy," which matched the telephone number assigned to JOUDEH's Phone.  Moreover, a review of text messages extracted from GAMBALE's Phone reveals contact between GAMBALE's Phone███ ████████████ and JOUDEH's Phone just days prior to GAMBALE's arrest by the LCSO on August 25, 2015.  Specifically, on August 21, 2015, "Ramy" texted "You good?" and "Everything good" from JOUDEH's Phone.  GAMBALE's Phone███████████ ███████ responded: "Landing now."  Based on my training and experience, as well as the investigation thus far, I believe that JOUDEH was confirming that GAMBALE had arrived in California as planned where GAMBALE would obtain additional marijuana as part of the distribution conspiracy.  As discussed above, GAMBALE was discovered just days later at a residence in California with, among other things, large quantities of marijuana, U.S. currency, a firearm and other drugs.  ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

E.    Collection of Money Related to the Drug Conspiracy

52.    Based on my training, experience and the investigation thus far, including a review of judicially authorized intercepted communications sent to and from JOUDEH's Phone, there is also probable cause to believe that the defendants RAMY JOUDEH, RUSSELL CARLUCCI, DANIEL ETKIN and others collected drug proceeds from various individuals on behalf of the defendant RICHARD GAMBALE. Among other things, JOUDEH, CARLUCCI and ETKIN collected proceeds for GAMBALE that was owed to GAMBALE and others in connection with the drug conspiracy discussed herein while GAMBALE was incarcerated and unable to make the collections and payments himself.

53.    On or about January 18, 2016, the defendant RICHARD GAMBALE was arrested for stabbing and fatally wounding an individual during a money-related dispute in Staten Island, New York. GAMBALE was arraigned on an indictment on or about March 2, 2016, and he remained incarcerated at Riker's Island, in the custody of the New York City Department of Correction. On or about October 4, 2016, GAMBALE was convicted, upon a plea of guilty, of Criminal Possession of a Weapon in the Third Degree: Previous Conviction, in violation of New York Penal Law § 265.02(1). GAMBALE was sentenced to two to six years' imprisonment.

54.    As discussed above, based on the investigation, there is probable cause to believe that while the defendant RICHARD GAMBALE was incarcerated, GAMBALE

25

relied on some of the CO-CONSPIRATORS to collect proceeds related to the drug conspiracy discussed herein.

      1.    Statements of John Doe 1

55.    I have been advised by an individual whose identity is known to the undersigned and referred to herein as John Doe 1 that the defendant RAMY JOUDEH collected money from John Doe 1 on behalf of the defendant RICHARD GAMBALE.[9] I have been advised by John Doe 1 that this money was owed to GAMBALE in connection with the drug conspiracy. John Doe 1 advised that after meeting GAMBALE, he purchased marijuana from GAMBALE for personal use. John Doe 1 also stated that he met an individual named "Russell" who also tried to sell him marijuana and who John Doe 1 believed was in business with GAMBALE. John Doe 1 identified a photograph of the defendant RUSSELL CARLUCCI as the individual he referred to as "Russell." Based on my training and experience, as well as the investigation thus far, it is my belief that John Doe 1 was referring to the defendant RUSSELL CARLUCCI when he said he had met an individual named "Russell" who was in business with GAMBALE.

56.    John Doe 1 further advised that he subsequently began selling some marijuana for the defendant RICHARD GAMBALE in late 2014 for approximately one year. John Doe

---

[9]    Based on the investigation, John Doe 1's statements are consistent with information obtained by law enforcement as part of the investigation. For example, as set forth below, a review of the contents of judicially authorized interceptions of communications sent to and from JOUDEH's Phone reveal multiple examples of JOUDEH's, CARLUCCI's and ETKIN's collection of proceeds on behalf of and in connection with GAMBALE. A search of John Doe 1's name revealed no criminal history.

1 also advised that he owed GAMBALE several thousand dollars and that a friend of GAMBALE's (Male 1) contacted him to collect the money owed to GAMBALE. Male 1 met with John Doe 1 multiple times to collect money. John Doe 1 did not know Male 1's name, but described him as a white male with short hair and glasses who drove a white BMW.[10] John Doe 1 subsequently identified a photograph of the defendant RAMY JOUDEH as the individual he knew as GAMBALE's friend who collected the money owed to GAMBALE (Male 1). John Doe 1 also stated that a second individual ("Male 2") came to collect money that he owed to GAMBALE for marijuana. John Doe 1 did not know Male 2's name, but subsequently identified a photograph of the defendant DANIEL ETKIN as the other man who came to collect money on behalf of GAMBALE (Male 2).

> 2.     Interception of JOUDEH's Electronic Communications

57.    On or about January 27, 2016, New York State Supreme Court Judge Bonnie Wittner signed a warrant authorizing the interception of communications sent to and from JOUDEH's Phone. On or about February 25, 2016, Judge Wittner reauthorized interception of communications sent to and from JOUDEH's Phone. On or about March 25, 2016, New York State Supreme Court Judge Michael R. Sonberg reauthorized additional interception of communications sent to and from JOUDEH's Phone. On or about April 22, 2016, Judge Sonberg again reauthorized interception of communications sent to and from JOUDEH's Phone.

---

[10]     I am advised by law enforcement that JOUDEH had access to several vehicles. I am further advised that while conducting physical surveillance of JOUDEH, DEA agents observed JOUDEH driving a white Audi on or about March 2, 2016.

58.    A review of transcripts of the content created by law enforcement of the intercepted communications between the defendant RAMY JOUDEH and the defendants RUSSELL CARLUCCI and DANIEL ETKIN, respectively, revealed several conversations related to, among other things, JOUDEH's, CARLUCCI's and ETKINS' collection of drug proceeds for the defendant RICHARD GAMBALE and others as part of the drug conspiracy described herein.

59.    For example, on or about February 3, 2016, law enforcement intercepted a telephone call from JOUDEH's Phone to CARLUCCI's Phone during which the two men discussed their progress obtaining money from various individuals.  The call is excerpted below as follows:[11]

| | |
|---|---|
| CARLUCCI: | I had to pick up a car, I had to drop off a car, and then I'm going back and I wanna pick up my car and then I'll shoot you a call.  I spoke to, uh, both that kid, that other kid is coming in tonight he was supposed to come this morning now he's coming tonight and, uh, the other kid, I spoke to him, I'm gonna see him on, uh, over the weekend he said. |
| JOUDEH: | Which one?  The one from Jersey or the other one from down there? |
| CARLUCCI: | The one from Jersey over the weekend the other kid tonight, downtown tonight, he's working tonight.  He texted me this morning that he's not coming in in the morning, he's coming in at night.  Said he'll see me tonight. |
| JOUDEH: | Aight yo, 'cause I need that bad right now. |

---

[11]    All portions and transcripts of excerpted calls are in draft form and subject to revision.

| | |
|---|---|
| CARLUCCI: | Well we're going to see him tonight. You can take a ride with me if you want or whatever. |
| JOUDEH: | Yeah. Yeah I'll take a ride 'cause I want to grab this kid a little bit because like he, he has that same number? 'Cause I call him and he doesn't answer. |
| CARLUCCI: | Yeah he texted me and he said "Hey, I'll be back tonight." Texted me at 2:31 p.m. |
| JOUDEH: | Yeah, I'll meet . . . let's go together. |
| CARLUCCI: | I'm assuming . . . he told me he was going to be back in the morning. |
| JOUDEH: | Yeah. Now you met up with the other kid downtown yet or no, you did right? |
| CARLUCCI: | Who? |
| JOUDEH: | The other kid that's down there. |
| CARLUCCI: | No I'm gonna see him tonight. Actually when I get back I'm going to call him. I'm gonna run into Jersey on his way to work I'm gonna grab him. |
| JOUDEH: | I'm talking about the other kid that's downtown. |
| CARLUCCI: | I seen him. He only gave me that five. That's it. He still didn't give me the rest. I'm gonna give him a call too. |
| JOUDEH: | Alright. |
| CARLUCCI: | When we go downtown we'll call them both, we'll meet up with both of them. |
| JOUDEH: | Well I spoke to him today. He's like, he needs a couple of days he said. |
| CARLUCCI: | He needs a couple of days? |
| JOUDEH: | Yeah. |

29

| | |
|---|---|
| CARLUCCI: | Alright. |
| JOUDEH: | He said, he said he gave 1,700 already? |
| CARLUCCI: | Yeah he gave me, he gave me five and then he gave me another 12, but I didn't know, I gave my sister some money because she had to fuckin' . . . . |
| JOUDEII: | All right that's good as long as you gave it to her that's fine then. |
| CARLUCCI: | I had to give her . . . my sister, she's all jammed up. |
| JOUDEH: | I just wanted to make sure he was telling me the truth, you know what I mean? |

Based on my training and experience, as well as the investigation thus far, during this conversation, JOUDEH and CARLUCCI were discussing the collection of money from multiple individuals, including a plan to meet up together in order to collect money from an individual. In addition, based on my training and experience, as well as the investigation, when JOUDEH said "He said, he said he gave 1,700 already?" and CARLUCCI responded "Yeah he gave me, he gave me five and then he gave me another 12," they were discussing the fact that this individual had already paid CARLUCCI a total of $1,700 in two separate payments of $500 and $1,200.

60.     On or about February 8, 2016, law enforcement intercepted a telephone call from JOUDEH's Phone to a cellular telephone number subscribed to by the defendant DANIEL ETKIN ("ETKIN's Phone"), during which call the defendants RAMY JOUDEH and DANIEL ETKIN discussed collecting money. A portion of the call is excerpted as follows:

| | |
|---|---|
| ETKIN: | What's on this week?  You collect anything or no? |

| | |
|---|---|
| JOUDEH: | I'm trying right now, actually. |

Based on my training and experience, as well as the investigation thus far, during this call, JOUDEH and ETKIN are discussing whether JOUDEH has collected any money that particular week (ETKIN: "You collect anything or no?"). JOUDEH, in saying "I'm trying right now, actually," was explaining to ETKIN that he was at that time attempting to collect additional money from one or more individuals.

61.     In addition, on March 1, 2016, law enforcement intercepted a telephone call from JOUDEH's Phone to ETKIN's Phone, during which call the two men again discussed collecting money from individuals in connection with money owed to the defendant RICHARD GAMBALE.  The call is excerpted as follows:

| | |
|---|---|
| JOUDEH: | I only care about [John Doe 2][12] and you. |
| ETKIN: | [Unintelligible] this other kid has to pay you so you can pay him. |
| JOUDEH: | There is two more, there's 17,000 between them and if I get 10,000. |
| ETKIN: | Do you really take them this long? |
| JOUDEH: | Well, I don't know.  Stop talking about it on the phone. |
| ETKIN: | Yeah whatever.  All right. |
| JOUDEH: | If I get them 15 grand, that leaves 12,000 left over and I'll give you six and I'll give Richie six, you know what I mean? |
| ETKIN: | Word. |

---

[12]     John Doe 2 is an individual whose first name and alias is known to the undersigned and hereinafter referred to as John Doe 2.

JOUDEH:    At the end of the day Richie only will owe five and [Unintelligible] owe like seven. That's it, it's not really a headache anymore. No one will kick a fuss on a fucking five or six thousand, you know you just pay it [Unintelligible]. But people will make a fuss over 23 grand.

ETKIN:    I know, you got a kid you grew up with, bothering for three grand. This kid ain't quiet, you know.

JOUDEH:    Imagine!

ETKIN:    *[Laughs]*

JOUDEH:    [Unintelligible], man, he put me in this fucking position. That's why honestly, I just want to get this ring sold, pay everybody off and I'm out. You know what I mean? I'm done, no more bullshit, that's it. I'm not trying to make any extra cash, I'm just staying out of it. I wish I've never dealt with [John Doe 2], I should let Richie and [John Doe 2] deal with it. You know what I mean?

ETKIN:    Yeah, but that probably would have been worse.

JOUDEH:    Yeah, but it wouldn't be our problem, mine or yours.

ETKIN:    Not true, it would it came back for me.

JOUDEH:    No, if you were like, "Listen, it's your decision, I want nothing to do with it if it goes bad." If he says, "yeah, I'll deal with him, or if he says no I am not doing it." Honestly the only reason I'm fucking worried about is 'cause of you.

ETKIN:    Yeah.

JOUDEH:    I swear to God, I don't want you to fucking deal with it.

ETKIN:    I appreciate, and I could promise you I was not never be.

JOUDEH:    Exactly, I'm keeping my word. I'll always keep my word, bro. But if him and Richie would deal from the beginning and let them do what the fuck they wanted and

|           | we stayed out it.  Right now he would [Unintelligible] and said, "But I told you, you do what you want, I want nothing to do with it."  He would be, "Right, you alright," and then it will be, fucking Richie's, for him and Richie would have to take the loss and see you later. |
| --- | --- |
| ETKIN: | Yeah. |
| JOUDEH: | That fucking [Unintelligible] is out of control now, you know what I mean? |
| ETKIN: | I just hope he could at least give him [Unintelligible] to keep him quiet for a while more. |
| JOUDEH: | Imma get him fifteen grand, trust me. |
| ETKIN: | For the next two weeks. |
| JOUDEH: | Imma try to get it by this week. |

Based on my training and experience, as well as the investigation thus far, during this call, JOUDEH and ETKIN were discussing collecting money from individuals owed to the defendant RICHARD GAMBALE and John Doe 2, and making payments to the GAMBALE and John Doe 2.  When JOUDEH stated: "there's 17,000 between them and if I get 10,000," I believe he is stating that $17,000 was owed between two individuals, and that JOUDEH could obtain $10,000, which would be a total of $27,000.  Moreover, when JOUDEH stated: "If I get them 15 grand, that leaves 12,000 left over and I'll give you six and I'll give Richie six, you know what I mean[,]" based on the investigation, it is my belief that JOUDEH was stating that of the $27,000, he would provide ETKIN with $6,000 and "Richie" with $6,000 as well.  Further, it is my belief, based on the investigation, that when JOUDEH referred to "Richie" during this call, he was referring to the defendant RICHARD GAMBALE.  As discussed above, a review of telephone records and recorded telephone calls reveals multiple

contacts between GAMBALE and JOUDEH's Phone prior to and after GAMBALE was

incarcerated.  It is also my belief, based on the investigation, that during this conversation,

JOUDEH and ETKIN were discussing whether GAMBALE or [John Doe 2] would "make a

fuss" over not obtaining approximately $3,000 of money owed to them.  In particular, based

on the investigation, including the excerpted calls above, there is probable cause to believe

that JOUDEH and ETKIN were discussing recouping money owed because of a loss of illicit

proceeds that the CO-CONSPIRATORS were expected to earn from the drug conspiracy.

During the call, when JOUDEH stated:

> That's why honestly, I just want to get this ring sold, pay
> everybody off and I'm out.  You know what I mean?
> I'm done, no more bullshit, that's it.  I'm not trying to
> make any extra cash, I'm just staying out of it.  I wish
> I've never dealt with the [John Doe 2], I should let
> Richie and the [John Doe 2] deal with it.  You know
> what I mean . . . .

I believe, based on the investigation, that JOUDEH was explaining that he planned to pay

off money owed and was not trying to make any additional money at that time ("I'm not

trying to make any extra cash, I'm just staying out of it").  In addition, when JOUDEH

stated: "Stop talking about it on the phone," based on my training and experience, JOUDEH

was suggesting to ETKIN that they should not discuss these matters over the telephone in

case law enforcement had intercepted the call given his knowledge that they were discussing

illegal matters related to their participation in an illegal drug conspiracy.

### 3.    Physical Surveillance of RAMY JOUDEH

62.    I am advised by agents from the DEA that the following day, on or about

March 2, 2016, DEA agents conducted physical surveillance of the defendant RAMY

JOUDEH. The DEA agents observed JOUDEH leave his residence in Brooklyn, New York,

carrying a black plastic bag. The agents further observed JOUDEH enter a vehicle, drive the

vehicle to a different location in Brooklyn and thereafter exit the car. DEA agents

approached JOUDEH and smelled a strong odor that they believed to be marijuana

emanating from the plastic bag. Inside of the bag, DEA agents discovered a small quantity

of marijuana inside of a Ziploc-type bag, which based on my training and experience, as well

as the investigation, was consistent with a sample amount of marijuana. JOUDEH told the

agents that he did not know the bag contained marijuana and that he had found the bag and

planned to throw it away. JOUDEH also informed the agents that he was an assistant district

attorney.[13] The DEA agents released JOUDEH at that time.

63.     Based on the investigation, as well as my training and experience, I believe

that prior to being stopped by law enforcement, the defendant RAMY JOUDEH was en route

to provide a sample of marijuana to a potential customer. On March 2, 2016, law

enforcement intercepted a telephone call from JOUDEH's Phone to the telephone of an

unidentified male ("UM"), during which conversation the two men discussed meeting up so

that the UM and his friend could sample JOUDEH's product. The call is excerpted as

follows:

> JOUDEH:          You're gonna meet me by yourself or with your man?
>
> UM:              It don't matter.

---

[13]     Based on the investigation, the defendant RAMY JOUDEH was working as an
Assistant District Attorney at the time.

35

| JOUDEH: | I don't care. You tell me. |
| UM: | I mean, he probably gonna want to check it out. |
| JOUDEH: | All right. So, what time? I'll be ready in the next half-hour. |

Based on my training and experience, as well as the investigation so far, during this conversation, JOUDEH and the UM were discussing meeting up because the UM's "man" (his associate) was "probably gonna want to check it out." Based on my training and experience and the investigation, when the UM said "check it out" he was referring to sampling JOUDEH's product, namely marijuana. Shortly after this call, the UM and JOUDEH had another conversation via telephone in which the UM updated JOUDEH that he was approximately 10 minutes away. The call is excerpted as follows:

| UM: | Hello. |
| JOUDEH: | Yo. |
| UM: | Yeah, I'm like 10 minutes away. |
| JOUDEH: | Alright, I'll meet you over there. I'm on my way now |
| UM: | Aight. |

64. On March 2, 2016, after the defendant RAMY JOUDEH was stopped by law enforcement with the black bag containing the sample size of marijuana, law enforcement intercepted another conversation between the UM and JOUDEH's Phone in which the UM and JOUDEH discussed JOUDEH being stopped by law enforcement. The call is excerpted as follows:

| JOUDEH: | Yo. |
| UM: | You good? |

36

| | |
|---|---|
| JOUDEH: | Yeah. I'm straight yo. |
| UM: | That shit just got me thinking. I'm just like yo. Out of everybody, how the hell did they just pick you out? |
| JOUDEH: | That's what I'm saying, yo. I think you gotta see what's up with your man, yo. |
| UM: | Nah. Nothin' wrong. It's nothin' with him. |
| JOUDEH: | You sure? |
| UM: | Positive. |
| JOUDEH: | Because it was like they were waiting for me to walk out of that fuckin' thing. You know what I mean? The dude was standing there in front of the sneaker shop. |
| UM: | I know it's hot over here, but that's what I'm tryin' . . . . I just don't understand, but it don't got nothin' to do with him. |
| JOUDEH: | All right. Give me five minutes. I'll call you right back. |

Based on my training and experience, as well as the investigation thus far, during this conversation, JOUDEH was speaking to the UM about having been stopped by law enforcement. Specifically, I believe that when JOUDEH said "I think you gotta see what's up with your man, yo," JOUDEH was questioning whether the UM's "man" (the UM's associate) had somehow alerted the police to the fact that JOUDEH was carrying drugs. The UM, however, was attempting to reassure JOUDEH that JOUDEH's being stopped by law enforcement had nothing to do with his associate ("Nah. Nothin' wrong. It's nothin' with him . . . . Positive."). A short time later on the same day, law enforcement intercepted another call between JOUDEH's Phone and the UM, during which call JOUDEH, the UM

37

and another individual, hereinafter referred to as John Doe 3, continued the conversation about JOUDEH being stopped by the police. The call is excerpted as follows:

| | |
|---|---|
| UM: | Yo. |
| JOUDEH: | Yeah. |
| UM: | Yeah. |
| JOUDEH: | I don't know yo. That was just weird. 'Cause that fuckin' that white guy he's the one in the sports jacket bro was just waiting in front of that Chinese store. When I got out of the car, he was already standing there. |
| UM: | Yeah. But, I mean. |
| JOHN DOE 3: | How did they just like snatch you up? |
| JOUDEH: | I just walked out to my car and the guy was like, "Yo. Yo turn around." He's like, "don't fuckin' move." I'm like, "the fuck?" "Do you have a fuckin' gun on you?" I'm: "I don't have a fuckin' gun on me. What are you talking about?" They put me up against the wall and four other guys came out fuckin' "put your hands up against the wall." I was like, "yo, I got my ID in my pocket. I got my ID in my pocket." I tried to reach for my pocket. He was like-- I have my hand in my pocket when he was looking at me. He's like "get your fucking hand out of your pocket." I got my hand out of my pocket. I put my hand up. Put 'em against a wall. Then, "do you have a gun on you?" "No, I have no gun." I was like, "what the fuck? What's going on?" . . . . I dropped the fuckin' bag. Dropped the bag. Fuckin' opened the bag. He's like, "what the fuck is it? I was like "I just found it and literally was just hit me in the foot. I was throwing it in the trash. I had to pick up a pair of sneakers, dude. I come here all the time." He's like, "put down my shit." He's like, "aight" and he calls his sergeant and had me there for a fuckin' hour, bro! Standing in the cold for a fuckin' hour! |
| UM: | Yeah, that shit was crazy. I ain't even gonna front 'cause I was like . . . [*Voices Overlap*] |

38

JOUDEH:            They handcuffed me!  I thought I was going in 'cause
                  they hand cuffed me.  That's it.  They put me in hand
                  cuffs.  I was in hand cuffs at one point.

                         *      *      *

Based on my training and experience, as well as the investigation thus far, during this

conversation, JOUDEH, the UM and John Doe 3 were further discussing JOUDEH being

stopped by law enforcement.  During the call, JOUDEH references the bag containing the

marijuana that was recovered by law enforcement when they stopped JOUDEH.  Specifically

when JOUDEH stated: "I was like 'I just found it and literally was just hit me in the foot.  I

was throwing it in the trash,'" he was referring to the bag containing the marijuana.  During a

later portion of the conversation, JOUDEH explains that he was fortunate to have had his

"ID" on him ("Obviously, they're not looking for weed.  You know what I mean?  Also, the

fact that I have ID and shit on me.  You know what I mean?  That helped me a lot.  If it

wasn't for my ID they probably would have took me.").  Based on the investigation, I believe

that JOUDEH was referring to his credentials for his position as an assistant district attorney

when he referred to his "ID."  Based on my training and experience, as well as the

investigation, which includes information obtained from the intercepted calls excerpted

above as well as other calls, JOUDEH was not truthful when he told law enforcement that he

had just found the bag and had intended to throw it away; rather JOUDEH was attempting to

conceal the fact that he was planning to meet the UM and his associate to provide them with

a sample of marijuana to effectuate a sale at a later date.  There is probable cause to believe,

therefore, that JOUDEH participated in the drug conspiracy described herein in multiple

ways, including by collecting proceeds related to the drug conspiracy and facilitating the sale of the drugs as well.

65.     Accordingly, there is probable cause to believe that the TARGET DEFENDANTS participated in a multi-state drug conspiracy, in violation of Title 21, United States Code, Sections 841 and 846, and other related statutes.



66.



67.

68.

69. 

## CONCLUSION, AUTHORIZATION REQUEST AND SEALING

WHEREFORE, your deponent respectfully requests that warrants be issued for the arrest of the TARGET DEFENDANTS, namely, the defendants RICHARD GAMBALE, RUSSELL CARLUCCI, RAMY JOUDEH and DANIEL ETKIN, so that they may be dealt with according to law.

42



Respectfully submitted,

PAUL HARRIS
Special Agent
FBI

Subscribed and sworn to before me on $\underline{A\text{-}gust}$ $\underline{\quad 9 \quad}$, 2019

/s/ SJB

THE HONORABLE SANKET J. BULSARA
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

43